**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JALAINE GETHERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 15-1559 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| PNC BANK, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This action arises from pro se Plaintiff Jalaine Gethers's ("Gethers") allegations that Defendant PNC Bank ("PNC") violated Title VII of the Civil Rights Act of 1964 ("Title VII"). Presently before the Court are PNC's and Gethers's Motions for Summary Judgment. (Docket Nos. 42, 47). In accord with the Court's Local Rules and Federal Rule of Civil Procedure 56, PNC submitted a brief in support, (Docket No. 43); a concise statement of material facts, (Docket No. 44); and an appendix accompanying its motion, (Docket No. 46). Gethers filed a brief in support of her motion, (Docket No. 47), and a concise statement of material facts, (Docket No. 48). PNC responded with a brief, (Docket No. 49), and a counter to her concise statement of material facts, (Docket No. 50). Gethers followed up with a "preliminary statement."[1] (Docket No. 51). The Court heard oral argument on the parties' Motions on January 9, 2017. (Docket No. 52, 56). At their request, the Court permitted them to file additional briefs and supporting evidence in order to address the evidence and arguments presented at the hearing. PNC submitted supplemental evidence with a brief in support, (Docket

---

[1] The Court's Local Rules and Federal Rules of Civil Procedure do not address "preliminary statements." The Court will construe, to the extent that it is able, Plaintiff's "preliminary statement" as a counter to PNC's concise statement of material facts. *See* FED. R. CIV. P. 56(e).

Nos. 58, 59), and Gethers added evidence to the record, (Docket No. 57). The parties then filed their respective responses to these filings. (Docket Nos. 60, 61). Hence, the Motions are now ripe for the Court's consideration.

In sum, the parties' arguments focus on whether Gethers's claims are properly supported by the record to necessitate a jury trial. PNC asserts that summary judgment should be granted in its favor because: (1) Gethers failed to identify any PNC comparator employees of another race who were similarly situated to her and treated more favorably by PNC; and (2) her termination lacked temporal proximity to her alleged protected activity such that she failed to state a prima facie retaliation claim. Gethers argues that the evidence supports summary judgment in her favor because she has proven that she was terminated as a result of race discrimination and retaliation.

For the following reasons, PNC's Motion for Summary Judgment, (Docket No. 42), will be granted, and Gethers's Motion for Summary Judgment, (Docket No. 47), will be denied.

## II.    Background

### A.    Local Rule 56.1 Violation

As an initial matter, the Court notes that Gethers failed to properly respond to PNC's Concise Statement of Material Facts, (Docket No. 44), as required by Local Rule 56.C.1, despite numerous opportunities to do so. Local Rule 56.C.1 requires non-moving parties to a motion for summary judgment to file their own concise statement responding to each numbered paragraph in the movant's concise statement. *See* LCvR 56.C.1. The non-moving party's concise statement must admit or deny the facts contained in the movant's concise statement; set forth the basis for denial, if any fact within the movant's concise statement is not entirely admitted by the non-moving party, with appropriate citation to the record; and set forth, in separately numbered paragraphs, any other material facts at issue. *See id.*

A non-moving party faces severe consequences for not properly responding to a moving party's concise statement. Any alleged material facts "set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." LCvR 56.E. Yet, Gethers did not specifically reply to each paragraph in PNC's concise statement in her responses to PNC's summary-judgment motion. (Docket Nos. 47, 48, 51, 57, 60).

Courts do provide some leniency to pro se litigants when applying procedural rules. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) ("[W]e tend to be flexible when applying procedural rules to pro se litigants, especially when interpreting their pleadings."). The Court, however, "'is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the defendant that counsel would normally carry out.'" *Id.* (quoting *Pliler v. Ford*, 542 U.S. 225, 231 (2004)). Rather, pro se litigants must adhere to procedural rules as would parties assisted by counsel. *McNeil v. United States*, 508 U.S. 106, 113 (1993) (explaining that "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel").

This Court "requires strict compliance with the provisions of [Local Rule 56]." *E.E.O.C. v. U.S. Steel Corp.*, No. 2:10-CV-1284, 2013 WL 625315, at *1 n.1 (W.D. Pa. Feb. 20, 2013) (internal quotations omitted); *see also* Practices and Procedures of Judge Nora Barry Fischer § II.E.(i), Effective Mar. 23, 2010, *available at* http://www.pawd.uscourts.gov/ Documents/Judge/fischer_pp.pdf. It is well settled that "failure to comply can result in penalties including the Court deeming as admitted a movant's facts where the non-movant does not

properly controvert them." Kiser v. Potter, No. 10-CV-22, 2012 WL 1134810, at *3-4 (W.D. Pa. Apr. 4, 2012) (disregarding the "Summary of Relevant Facts" section of the plaintiff's brief because "the Local Rules provide that the [responsive concise statement of material facts] is the exclusive means to controvert a movant's allegedly undisputed facts," which the plaintiff had failed to provide). Accordingly, to the extent Gethers's allegations of facts contained in her pro se responses do not address a particular concise statement of material fact by PNC, that concise statement of material fact will be deemed admitted. LCvR 56.E; *see also Boyd v. Citizens Bank of Pa., Inc.*, No. 12-CV-332, 2014 WL 2154902, at *2-3 (W.D. Pa. May 22, 2014) (applying Local Rule 56.E and concluding that "to the extent [the pro se] Plaintiff's recitation of the facts do not specifically address Defendant's statement of facts, Defendant's statement will be deemed admitted"). On the other hand, the Court will consider any facts properly set forth in Gethers's pro se responses that specifically contradict PNC's statement of facts. *See* FED. R. CIV. P. 56(e); *Boyd*, 2014 WL 2154902, at *3 (stating that "[t]o the extent Plaintiff's statement of 'fact' specifically controverts Defendant's, the Court will consider these facts in determining whether summary judgment should be granted").

### B. Overview of the Facts

#### 1. Gethers's Employment History

Gethers is African-American and worked for PNC's Automated Clearing House ("ACH") in Pittsburgh, Pennsylvania. (Docket No. 44 at ¶ 1). PNC initially hired her as an Operations Clerk II in April 1996. (*Id.*). She then worked for PNC's ACH Returns team until August 2013. (*Id.* at ¶ 2). Rosalind Jackson ("Jackson"),[2] who is also African-American, joined Gethers in the ACH Returns team in 1999; Jackson and Gethers became friends. (*Id.* at ¶ 3). Beginning in

---

[2] Jackson is a plaintiff in another action pending before this Court, at Docket No. 15-230. *See Jackson v. PNC Bank*, No. 15-CV-230, 2016 WL 7324595, at *2 (W.D. Pa. Dec. 16, 2016).

February 2013, Amy Yates ("Yates"), a manager in the ACH Operations Department, became Gethers's and Jackson's direct supervisor. (*Id.* at ¶ 6). Yates, who is Caucasian, *see id.*, reported to Duane Fahrion ("Fahrion"), Operations Manager for PNC's ACH Returns, Reconcilement, Government Processing, and Compliance functions. (Docket No. 44 at ¶¶ 4, 6). Prior to February 2013, Fahrion was Gethers's and Jackson's direct supervisor, a role he began in February 2010. (*Id.* at ¶ 4). He promoted Gethers to a Funds Transfer Work Lead ("Team Lead") position in October 2010. (*Id.* at ¶ 5). However, in March 2011, her performance review called for improvement in her attitude. (*Id.* at ¶ 78). Gethers's performance review for 2012 stated that she did not meet the expectations of professionalism when interacting with all levels of PNC employees. (Docket No. 57-2 at 13-14).

2. *ACH Transactions and Reg E Procedures*

Gethers and Jackson processed ACH transactions for PNC. ACH transactions allow consumers to directly debit their bank accounts to pay bills. (Docket No. 44 at ¶ 7). ACH return transactions are processed when a consumer disputes unauthorized electronic payments. (*Id.* at ¶ 8). Consumers disputing debits to their PNC accounts must follow PNC's procedures. (*Id.* at ¶ 10). The consumer must initiate the dispute by visiting a retail bank branch, contacting PNC's National Financial Service Center ("NFSC"), or using PNC's online-banking system. (*Id.*). PNC then asks the consumer questions to gather information regarding the dispute and enters the information into its Customer Relationship Inquiry Service System ("CRISS"). (*Id.* at ¶ 11). Next, the consumer must complete and sign a Written Statement of Unauthorized or Improper Debit ("WSUD"), which is then sent to the ACH Returns team. (*Id.* at ¶¶ 12-13).

Because the Federal Reserve regulates ACH transactions through a group of regulations called "Reg E," PNC's Reg E Dispute Resolution Group ("Reg E Group") investigates consumer return transactions. (*Id.* at ¶ 14). In conducting its investigations, the Reg E Group evaluates

information previously entered into the CRISS system about the transaction and then communicates through CRISS to discuss the dispute with the ACH Returns team. (*Id.* at ¶ 16). PNC's written procedures, which Gethers "helped write," require the ACH Returns team to review the Reg E Group's notes entered in CRISS. (*Id.* at ¶¶ 17-18). But, Gethers recalled that "it was never necessarily stated that you had to submit a CRISS case." (Docket No. 57-2 at 18). The ACH Returns team then processes the return transaction for the consumer after the Reg E Group provides its permission. (Docket No. 44 at ¶ 19). PNC maintains that employees with bank accounts at PNC must follow the same procedures as any other PNC consumer to initiate an ACH return transaction. (*Id.* at ¶ 21). Gethers disagreed in her deposition, stating that PNC employees could submit their proposed return transactions directly to the ACH Returns team. (Docket No. 57-2 at 16). She then acknowledged that no written policy or procedure expressly permits PNC employees to submit their returns directly to the ACH Returns team. (*Id.*).

### 3. *Events Leading to Gethers's Termination*

While on vacation on July 25, 2013, Jackson called Gethers at work and informed her that she was coming to the office to complete two WSUDs to reverse two transactions. (Docket No. 44 at ¶¶ 22-23). Yates learned about Jackson coming to the office, (Docket No. 46-4 at ¶ 14), but there are differing accounts as to what Yates did next. In her declaration, Yates states, "I informed Gethers that [Gethers] could not process the return transactions for Jackson[] and that she should not do so if Jackson came into the office." (*Id.* at ¶ 15). According to Yates, Gethers later told her that she had processed Jackson's return transactions. (*Id.* at ¶ 16). Gethers disagreed, stating that Yates "did not tell her not to process the dispute." (Docket No. 46-5 at 20). She continued that Yates did not say anything substantive to her about processing Jackson's return transactions. (Docket No. 46-1 at 67-68). Gethers described Yates standing between her and Jackson's desk as Jackson filled out her written statements and she processed them. (*Id.* at

68). She testified that Yates "looked at me, she watched me process on my screen." (*Id.* at 70). Because Jackson did not initiate her ACH transactions by going to a retail branch or contacting the NFSC, information regarding the return transactions was not entered into CRISS, and the transactions were not sent to the Reg E Group for investigation. (Docket No. 44 at ¶ 26).

After Gethers processed the return transactions for Jackson, Yates contacted PNC's Employee Relations Information Center ("ERIC") and reported that Gethers and Jackson may have circumvented procedures. (*Id.* at ¶¶ 27-29). PNC Senior Employee Relations Investigator Jean Olenak ("Olenak") opened an investigation. (*Id.* at ¶ 30). When Olenak spoke with Gethers and Jackson, they both admitted that the return transactions at issue had occurred. (*Id.* at ¶¶ 32-33). Jackson also conceded that she did not go to a retail branch or contact the NFSC. (*Id.* at ¶ 33). Subsequently, Olenak placed Jackson and Gethers on administrative leave while she completed the investigation. (*Id.* at ¶ 34). When Fahrion learned in July 2013 that Gethers and Jackson circumvented procedures for ACH transactions, he provided Olenak with documents showing the transactions Gethers processed for Jackson. (Docket No. 46-3 at ¶¶ 12-13). Olenak found that Gethers had processed at least nine return transactions for Jackson between May and July 2013 without using the proper procedures. (Docket No. 44 at ¶¶ 35-36).

Olenak concluded that both Jackson and Gethers had violated PNC's code of ethics and, specifically, the provisions regarding conflicts of interest, by circumventing the procedures for processing and approving Jackson's return transactions. (*Id.* at ¶ 41). The code of ethics, which requires employees to "always act in a professional, honest and ethical manner when conducting your activities with and on behalf of PNC," provides:

> We are expected to make sound business decisions in the best interests of PNC, undistorted by personal interests. A conflict exists when personal interests influence decisions that should be made solely on behalf of PNC or its clients.

We must never use our position at PNC for inappropriate personal gain or advantage to us or a member of our family. Any situation that creates a conflict of interest between personal interests and the interests of PNC should be avoided.

(*Id.* at ¶¶ 42-43). The code of ethics delineates employee responsibilities and additional responsibilities of PNC leadership as follows:

Employee Responsibilities

As a PNC employee, you are responsible for understanding and adhering to this Code.

➢ Always act in a professional, honest, and ethical manner when conducting your activities with and on behalf of PNC.

➢ Be familiar with the information contained in this Code and related ethics, human resources, and compliance policies. In addition, you should be well versed in any specific policies that pertain to your job responsibilities.

➢ Do not engage in or tolerate inappropriate harassment of, discrimination against, or bias toward another employee.

➢ Provide all required notifications and obtain necessary approvals. If you are in doubt as to whether or not notification or approval is required in a particular situation, seek guidance from your supervisor, manager, or the Corporate Ethics Office.

➢ Never ask another employee to do something that would be prohibited by this Code.

➢ Cooperate and provide honest and accurate information in investigations, regulatory examinations, audits, and similar types of inquiries.

➢ Promptly report concerns about possible violations of laws, regulations, or this Code, whether it be by a colleague, customer, or vendor, to the appropriate individuals. The section of the Code titled "Asking Questions and Raising Concerns," found on page 7, details several methods by which you can report your concerns.

➢ Complete required Code of Business Conduct and Ethics training in a timely manner and keep up-to-date on current standards and expectations.

Additional Responsibilities of PNC Leadership

If you are in a leadership position at PNC, you have additional responsibilities.

➢ Create a work environment where ethical business conduct is recognized and valued.

➢ Never permit or ask an employee or anyone acting on behalf of PNC to do something that would be prohibited by this Code.

> ➢ Be a resource for employees.  Communicate to employees about how the
> Code and related policies apply to their daily work.

(Docket No. 46-5 at 10).  While employed by PNC, Gethers reviewed the code of ethics, understood that she had to abide by it, and received annual training on it.  (Docket No. 44 at ¶ 44).

Olenak recommended to Yates that Gethers and Jackson be terminated, and Yates agreed. (*Id.* at ¶ 45).  In her declaration, Olenak states that PNC has a corrective action policy applying to some employee performance and conduct issues.  (Docket No. 59-2 at ¶ 3).  The policy attached to Olenak's declaration, which was implemented in 2011 and was in place at the time of Gethers's termination, states that "[v]iolations of the Code of Business Conduct and Ethics" could result in accelerated corrective action.  (*Id.* at 5; Docket No. 63 at ¶¶ 3-7; Docket No. 63-1; Docket No. 63-2; Docket No. 63-3).  The policy also provides that PNC reserves the right to immediately terminate an employee without engaging in corrective action.  (Docket No. 59-2 at 5).  On August 7, 2013, PNC terminated Gethers and Jackson.  (Docket No. 44 at ¶¶ 46, 48). When Olenak informed Gethers of her termination, she did not raise any concerns related to discrimination or retaliation.  (*Id.* at ¶¶ 47, 106).

4.      *Gethers's Claim that PNC Treated Similarly Situated Employees Differently on the Basis of Race*

Gethers argues that in 2007, Jackson processed return transactions for PNC employee Alicia Fletcher ("Fletcher") without either of them losing their jobs.  (*Id.* at ¶ 53).  Fletcher, who is African-American, first tried to dispute charges on her bank account by going to a retail branch.  (*Id.* at ¶¶ 53, 55).  Because the retail branch could not help her, Fletcher asked Jackson and Jackson's supervisor at the time, Judith Webster ("Webster"), for assistance.  (*Id.* at ¶¶ 55-56).  PNC investigated this as a potential code of ethics violation, but found none because:

(1) Fletcher first followed PNC's required procedures before going to the ACH Returns Team; and (2) Webster permitted Jackson to approve Fletcher's returns.  (*Id.* at ¶¶ 54, 56-57).

Gethers also maintains that she processed return transactions for three other PNC employees who were not terminated.  (*Id.* at ¶¶ 49-50).  These employees were:  Webster and Keith Patterson ("Patterson"), both of whom are white; and a third individual whom Gethers is presently unable to identify.  (*Id.* at ¶ 50).  Gethers admits that she does not know if these three employees followed proper procedures or received supervisor permission before their return transactions were processed.  (*Id.* at ¶ 51).  Gethers told no one at PNC except Jackson that she processed returns for Webster, Patterson, and the unidentified employee.  (*Id.* at ¶ 52).  No record evidence indicates that Yates, or anyone else, knew that Gethers had processed returns for other PNC employees.  (*Id.*).

At oral argument, Gethers mentioned that PNC did not terminate white employees, Cindy Jablonski ("Jablonski") and Marylou Rainey ("Rainey"), even though they did not document return transactions in the CRISS system.  (Docket No. 56 at 43-44).  Gethers, however, did not support this assertion with record evidence.[3]  In response, Yates and Fahrion declared that they were not aware that Jablonski or Rainey improperly processed ACH return transactions.  (Docket Nos. 59-3 at ¶ 11; 59-4 at ¶ 5).

Additionally, PNC revealed that it terminated two Pittsburgh-area employees in its Operations department in 2013—besides Gethers and Jackson—for violating PNC's code of ethics by engaging in conflicts of interest.  (Docket No. 44 at ¶ 58).  Specifically, PNC fired a white employee for processing a transaction on his own account and an Asian employee for overriding PNC's internal policies and procedures.  (*Id.* at ¶¶ 59-60).

---

[3] When asked for information regarding comparators, Gethers had not identified these individuals at her deposition. (Docket No.46-1 at 74; *see also* Docket No. 58 at 5 n.1).

Gethers next contends that a white employee, Barbara Siko ("Siko"), received preferential treatment as compared to her and Jackson by being permitted to miss a mandatory training class. (Docket No. 46-1 at 75-76). The record evidence shows that Siko had worked in various positions at PNC since 1998 and was promoted in January 2013 to a Funds Transfer Work Leader position[4] on PNC's ACH Reconcilement team. (*Id.* at ¶¶ 89-90, 93). Sometime after Siko became a Team Lead in early 2013, Siko and Gethers were required to take management-training classes. (*Id.* at ¶ 96). While Gethers attended, Siko missed one class because she had work to complete. (*Id.* at ¶¶ 96, 98). PNC claims that Gethers lacked "knowledge of whether Siko spoke to anyone at PNC before she missed the class" and "had no problem going to the class even though Siko was not attending." (*Id.* at ¶¶ 97-98).

Gethers's deposition testimony paints another picture. Gethers recalled that "[Siko] had to take the class to keep her Team Lead position." (Docket No. 46-1 at 76). Gethers heard this from Yates, who, during a conversation with her and Siko, remarked that Gethers had to take the class "to have a chance to become a supervisor." (*Id.* at 81). Hence, Gethers testified that Siko did not lose her Team Lead position despite not attending the class. (*Id.* at 76).

Gethers also alleges that Fahrion did not terminate Siko after "she walked out on the job" and did not return. (Docket No. 44 at ¶¶ 99-100). To that end, she declared that Fahrion "refused to have [Siko] reported to HR. He asked Amy Yates to continue to call [Siko] so that she could keep her job." (Docket No. 46-1 at 16). Yates did not just try to call Siko; she also called Gethers and told her that Siko "had walked out." (*Id.* at 83). Gethers submitted a telephone call log purportedly showing Yates's calls to her about Siko leaving her position. (Docket No. 57-1 at 2). Gethers learned from Yates that Siko remarked that "she was tired of this—and she used profanity." (Docket No. 46-1 at 84).

---

[4] Gethers did not apply for the promotion that Siko received. (Docket No. 44 at ¶ 91).

PNC portrays Gethers as "admit[ting] . . . that she has no personal knowledge of Siko's employment status after she allegedly walked out on the job." (Docket No. 44 at ¶ 101). PNC bolsters its position with a resignation letter from Siko effective June 7, 2013. (*Id.* at ¶ 102). About a month and a half later, PNC rehired Siko as an Operations Analyst. (Docket No. 44 at ¶ 102). Fahrion and Yates did not participate in hiring or supervising Siko as an Operations Analyst. (Docket Nos. 59-3 at ¶ 10; 59-4 at ¶ 4). Further, Siko lost all of her previous seniority with PNC, was considered a new employee, and earned a lower salary than she had had in her previous position. (Docket No. 59-2 at ¶ 4).

   5.    *Gethers's Retaliation Claim*

Gethers claims that Fahrion retaliated against her after she reported him to the ERIC in August 2012 when he promoted a white employee, Michelle Merz ("Merz") in July 2012.[5] (Docket Nos. 44 at ¶ 79; 46-1 at 16-17; Docket No. 46-3 at ¶ 8; 47 at 3). The position required, in part, that applicants have a college degree. (Docket No. 44 at ¶ 63). Gethers did not have a college degree, while Merz satisfied the position's educational requirements, had experience working in ACH operations, and had an ability to communicate with management. (*Id.* at ¶¶ 70-71). Gethers argues that Fahrion would not approve classes for her, saying that she had too much work, and after she reported Fahrion, he became "very cold" towards her at work by not speaking to her often on work-related matters. (Docket Nos. 46-1 at 17; 57-2 at 6). At her deposition, Gethers acknowledged that she did not tell Fahrion that he had reported him, and she admitted that she has no knowledge that Fahrion was aware of her report. (Docket No. 44 at ¶ 86). PNC investigated Gethers's complaint, through which Employee Relations Investigator Jodie Fine-Sheriff ("Fine-Sheriff") spoke to Gethers and to thirteen other members of the ACH

---

[5] To the extent that Gethers's case could be read as a failure-to-promote claim, the below discussion, *infra* Section IV.C, addresses same.

Operations Department.  (*Id.* at ¶¶ 79-82; Docket No. 59-5 at ¶ 9).  Fine-Sheriff determined that Gethers's report was unfounded, as no one but Gethers complained about racial discrimination, and she did not meet the qualifications for the position for which Merz was selected.  (Docket No. 44 at ¶ 83; Docket No. 59-5 at ¶ 9).  Gethers did not escalate her complaint any further or contact the ERIC to report that her concerns were not addressed.  (Docket No. 44 at ¶ 84).  Aside from reporting Fahrion to the ERIC, Gethers did not raise any other complaints or concerns related to discrimination during her employment with PNC.  (*Id.* at ¶ 106).[6]

Gethers also avers that PNC retaliated against her by opposing her receipt of unemployment benefits.  She points to the fact that PNC denied her unemployment application but approved Jackson for unemployment, even though PNC terminated them at the same time. (Docket No. 46-1 at 88).  PNC responds, in part, that it does not handle claims for unemployment compensation; rather, Equifax does.  (Docket No. 59-2 at ¶¶ 5-6; *see also* Docket No. 58 at 10).  Yet, following the appeal process, Gethers received unemployment compensation. (Docket No. 46-1 at 88).

## III.  <u>Standard of Review</u>

A grant of summary judgment is appropriate when the moving party establishes "'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)).  A genuine dispute of material fact is one that could affect the outcome of litigation.  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

---

[6] She acknowledged that Fine-Sheriff suggested a development plan for her.  (Docket No. 57-2 at 10).  She also admitted that Fahrion had previously spoken to her about her interactions with management.  (*Id.* at 11).

there is no genuine issue for trial.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine disputes. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine dispute in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine dispute. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324). "[U]nsubstantiated arguments made in briefs or at oral argument are not evidence to be considered." *Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1370 (3d Cir. 1993) (citing *Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 720 (3d Cir.

1989)).  Just like counseled parties, pro se litigants must adhere to procedural rules.  *McNeil*, 508 U.S. at 113.

## IV.   <u>Discussion</u>

Gethers alleges that PNC discriminated against her by terminating her on the basis of race and retaliating against her because she complained internally that Fahrion denied her a promotion due to her race.  Unless there is evidence of direct discrimination, claims under Title VII are analyzed under the burden-shifting framework created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  The *McDonnell Douglas* framework contains three steps.  First, a plaintiff must show a prima facie case for unlawful employment discrimination.  This framework requires that Gethers establish a prima facie case by demonstrating that:  (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) the adverse employment action occurred in a manner raising an inference of unlawful discrimination.  *See id.* at 802.  The Court determines whether a plaintiff establishes a prima facie case as a matter of law.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

If a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason ("LNDR") for the adverse employment action.  *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).  Once the employer does so, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were merely a pretext for discrimination, and not the true motivation for the adverse employment action.  *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Although the *McDonnell Douglas* framework is used to analyze both Title VII unlawful termination and retaliation claims, the Court will analyze

Gethers's claims separately because the elements necessary to state a prima facie claim for each differ.

## A. Unlawful Termination

Gethers must set forth a prima facie Title VII unlawful termination case before the Court considers PNC's reasons for terminating her. The parties do not dispute that the first three elements of Gethers's prima facie case have been established because: (1) she is African American, (Docket No. 44 at ¶ 1), and a member of a protected class; (2) she was qualified for her former position as a Team Lead on PNC's ACH Returns team, (*Id.* at ¶ 5); and (3) her termination is an adverse employment action. (*See* Docket No. 43 at 12 (wherein PNC argues that its Motion for Summary Judgment must be granted because Gethers cannot establish the fourth element of her claim)). Thus, the sole element in dispute is whether Gethers has advanced sufficient record evidence showing that her termination raised an inference of unlawful discrimination.

Gethers contends that PNC treated similarly situated employees outside of her protected class (her comparators) more favorably. "In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998) (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1993)). "The question of whether other employees are 'similarly situated' is fact-intensive," *Sims v. Court of Common Pleas of Allegheny County*, No. 10-CV-151, 2010 WL 3896428, at *4 (W.D. Pa. Sept. 30, 2010), but it is a question of law. *Sarullo*, 352 F.3d at 797. "The employee's positive performance in another category is not relevant and neither is the employee's judgment as to the importance of the stated criterion." *Simpson*, 142 F.3d at 647 (internal citation omitted) (citing *Healy v. N.Y.*

*Life Ins. Co.*, 860 F.2d 1209, 1216 (3d Cir. 1988)).  Federal courts employ many factors when weighing whether alleged comparators are similarly situated:

> Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated.  In this particular context—workplace disciplinary and/or personnel actions—relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."

*McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)) (citation omitted); *see also Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (recognizing same general legal principles); *Epps v. First Energy Nuclear Operating Co.*, No. 11-CV-1462, 2013 WL 1216858, at *18 (W.D. Pa. Mar. 25, 2013) (same).

Gethers and Jackson both admitted that they initiated the return transactions at issue without visiting a retail bank or contacting the NFSC.  (Docket No. 44 at ¶¶ 32-33).  Gethers processed at least nine return transactions for Jackson between May and July 2013 even though Jackson did not visit a retail bank or contact the NFSC first.  (*Id.* at ¶¶ 26, 31-37).  She maintained in her deposition that PNC employees could submit return transactions directly to the ACH Returns team.  (Docket No. 57-2 at 16).  Despite her stance, following an investigation, she was fired.  What matters is whether PNC treated similarly non-African-American employees who also circumvented PNC's procedures without first contacting a retail bank or the NFSC.

Gethers contends that PNC employees Fletcher and Jackson were not terminated in 2007 when they circumvented PNC's ACH transaction procedures and that this shows that PNC treated other employees differently than it treated her.  But, Fletcher is not a similarly situated employee to Gethers.  First, Fletcher is African American, making Fletcher an improper

comparator employee because she and Gethers are members of the same protected class. (*Id.* at ¶ 53); *Simpson*, 142 F.3d at 647 (citing *Ezold*, 983 F.2d at 528) (comparator analysis measures "whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class"). Second, Fletcher handled her return transactions much differently than Gethers. Fletcher tried to dispute charges on her bank account by going to a retail branch. (Docket No. 44 at ¶ 55). Jackson's then-supervisor, Webster, allowed Jackson to approve Fletcher's return transactions. (*Id.* at ¶¶ 55-56). Third, PNC did not impose a sanction because: (1) Fletcher first followed PNC's required procedures before going to the ACH Returns Team; and (2) Webster permitted Jackson to approve Fletcher's returns. (*Id.* at ¶¶ 54, 56-57). Fletcher received permission to override PNC's ACH transaction procedures, while Gethers did not. (*Id.* at ¶ 57); *Simpson*, 142 F.3d at 647 ("[T]he focus is on the particular criteria . . . identified by the employer as the reason for the adverse action.") (citing *Ezold*, 983 F.2d at 528). Thus, Fletcher is not similarly situated to Gethers, and Gethers's claim fails to the extent that it relates to PNC's treatment of Fletcher.

Gethers also alleges that she processed transactions for three PNC employees who were not terminated: Webster (white); Patterson (white); and an unnamed individual (race unknown). (Docket No. 44 ¶¶ 49-50). But, no evidence shows that the PNC decision makers who fired Gethers learned that she processed returns for these three employees. Hence, there is no proof before this Court that PNC treated them differently than Gethers. (*Id.* at ¶ 52); *Guidotti*, 716 F.3d at 773 (citing *Celotex Corp.*, 477 U.S. at 324). Moreover, Gethers does not know whether Webster, Patterson, or the unnamed employee attempted to follow PNC's ACH transaction procedures or received permission from their supervisors to have the transactions returned. (Docket No. 44 at ¶ 51). As unsupported allegations are not sufficient for this Court to permit

this claim to go before a jury, it likewise fails.  *Simpson*, 142 F.3d at 647 (citing *Ezold*, 983 F.2d at 528).

During oral argument, Gethers highlighted that PNC is biased against African-American employees because it did not terminate Caucasian employees, Jablonski and Rainey, for not documenting return transactions in CRISS, while ascribing similar conduct to Gethers and Jackson.  (Docket No. 56 at 43-44).  Again, Gethers's opinion is unsubstantiated because she did not support it with record evidence, despite an opportunity to do so.  (Docket No. 53).  Yates and Fahrion have since declared that they had no knowledge that white employees, Jablonski or Rainey, improperly processed ACH return transactions.  (Docket Nos. 59-3 at ¶ 11; 59-4 at ¶ 5).  As a result, the bald allegations that Jablonski and Rainey were not punished for their alleged failure to document return transactions in CRISS while Gethers, an African American, was, are not sufficient for Gethers to avoid summary judgment.  *See Versarge,* 984 F.2d at 1370 ("[U]nsubstantiated arguments made in briefs or at oral argument are not evidence to be considered.").

In further response to this argument, PNC has presented evidence showing that it terminated two other Pittsburgh-area employees in its Operations department in 2013 for creating conflicts of interest and violating PNC's code of ethics.  (Docket No. 44 at ¶ 58).  Specifically, PNC fired a white employee for processing a transaction on his own account and an Asian employee for overriding its internal policies and procedures.  (*Id.* at ¶¶ 59-60).  While this evidence alone does not justify granting PNC's Motion for Summary Judgment, the Court acknowledges that such conduct and its repercussions are analogous to Gethers's.

Gethers next cites two incidents that involved fellow PNC Team Lead Siko as evidence that PNC treated a comparator employee better than she was treated.  (*Id.* at ¶¶ 89-90).  In the

first incident, PNC required Siko and Gethers to take management-training classes. (*Id.* at ¶ 96). Gethers attended the class but Siko did not because she claimed that she had too much work to complete. (*Id.* at ¶¶ 96, 98). Despite missing the class, Siko remained a Team Lead. (Docket No. 46-1 at 76). In the second incident, Siko "walked out on the job" and did not return, (Docket No. 44 at ¶¶ 99-100), yet Fahrion "refused to have [Siko] reported to HR. He asked Amy Yates to continue to call [Siko] so that she could keep her job." (Docket No. 46-1 at 16). Nearly a month and a half later, PNC rehired Siko as an Operations Analyst. (Docket No. 44 at ¶ 102).

Siko missing a class and walking off the job versus PNC terminating Gethers for not following ACH transaction procedures is an "apples-to-oranges" comparison. *Simpson*, 142 F.3d at 647 (comparator analysis focuses "on the particular criteria . . . identified by the employer as the reason for the adverse action," which is the code of ethics violation here) (citing *Ezold*, 983 F.2d at 528). Rather, Gethers must put forward facts more analogous to the circumstances of her termination showing that PNC is tougher on African-American employees who violate the code of ethics or bypass return transaction procedures than it is on other-race employees. She has not been able to make that showing. Accordingly, this argument does not advance her case.

Gethers also brings up the events leading to her termination as proof that PNC fired her on the basis of race. (Docket No. 46-1 at 70-73). PNC and Gethers have different accounts regarding how Yates learned that Gethers processed Jackson's return transactions without creating a CRISS case. Yates declares, "I informed Gethers that [Gethers] could not process the return transactions for Jackson[] and that she should not do so if Jackson came into the office." (Docket No. 46-4 at ¶ 15). She further avers that Gethers later told her that she processed Jackson's return transactions. (*Id.* at ¶ 16).

Gethers states that Yates "did not tell her not to process the dispute." (Docket No. 46-5 at 20). She testified that Yates did not say anything substantive to her about processing Jackson's return transactions, (Docket No. 46-1 at 67-68), despite the fact that Yates stood between her and Jackson's desk as Jackson filled out her written statements and Gethers processed them. (*Id.* at 68). According to Gethers, Yates "looked at me, she watched me process on my screen." (Docket No. 46-1 at 70).

With this backdrop, Gethers contends that Yates's failure to stop her and Jackson from circumventing PNC's ACH transaction procedures "is an example of entrapment by an employer to get rid of an employee" and that this constitutes unlawful race-based termination. (Docket No. 57 at 1).[7] The Court acknowledges that it must view the parties' recollections in the light most favorable to Gethers, the non-moving party. *Bialko*, 434 F. App'x at 141 n.4. To this end, the Court notes that entrapment is generally a defense employed in criminal matters. *See Jones v. Bombeck*, 375 F.2d 737, 738 (3d Cir. 1967) (noting that entrapment may be a proper defense in criminal actions). To the extent that Gethers makes an entrapment argument, the Court construes it as one of pretext. Gethers's argument would be viable if she had shown that Yates prevented a non-African-American employee from violating ACH-transaction procedures and did not report that employee to the ERIC. *Simpson*, 142 F.3d at 647 (citing *Ezold*, 983 F.2d at 528) (comparator analysis focuses "on the particular criteria . . . identified by the employer as the

---

[7] The Court notes that PNC's code of ethics does require that one in a leadership position never permit an employee to do something that would be prohibited by the code. (*See* Docket No. 46-5 at 10). Here, viewing the facts in a light most favorable to Gethers, Yates could be seen as a "leader" "permitting" an employee to act against the code. However, the record is clear that Yates did report both Gethers and Jackson, as she was required to do per the code. (*See* Docket Nos. 44 at ¶¶ 27-29; 46-5 at 10). Moreover, the employee manual addressing corrective action requires employees to follow established policies and procedures. (Docket No. 63-1 at 2). Although a progressive corrective action is described, PNC reserves the right to depart from same "when, at its sole discretion, such departure is warranted based on facts and circumstances of the situation." (*Id.*). Examples of performance issues that may result in accelerated corrective action include violations of the code of ethics. (*Id.*). The employee manual further provides that "[e]mployment with PNC is always on an at-will basis, and either PNC or you may decide to terminate the employment relationship at any time and for any reason." (*Id.*).

reason for the adverse action"). However, the record evidence does not support this contention. Rather, as PNC has argued, Yates had a duty to report the unethical conduct that she had observed. (*See* Docket Nos. 44 at ¶¶ 42-43; 46-5 at 10).

After considering Gethers's assertions that PNC terminated her because of her race, the Court concludes that none of her arguments or the evidence she cites indicates that PNC treated a similarly situated employee better than it treated her because of race. Thus, she fails to state a prima facie unlawful-termination claim under Title VII and is not entitled to a jury trial on that claim. Therefore, the Court need not address whether PNC demonstrated an LNDR for firing Gethers or if PNC's LNDR was pretext for unlawful racial discrimination. For completeness, however, the Court will briefly address the issue. Based upon Gethers's and Jackson's admissions, it appears that they violated PNC's code of ethics, despite Gethers's acknowledgement that she reviewed the code of ethics, understood that she had to abide by it, and received annual training on it. (Docket No. 44 at ¶ 44). Given these undisputed facts, the Court finds that PNC had an LDNR for terminating Gethers and Jackson. Indeed, for these same reasons, the Court granted PNC's motion for summary judgment in Jackson's case, *see Jackson*, 2016 WL 7324595, at *7, and will do the same here.

**B. Retaliation**

Gethers claims that PNC retaliated against her because she complained to the ERIC that Fahrion promoted a white employee instead of her due to race. Retaliation is defined by federal law as "an employer . . . discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

To succeed in her retaliation claim, Gethers must first state a prima facie case. To do so, she must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017); *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995). "[T]he anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)). Employees must have a good faith, objectively reasonable belief that the activity she opposes (or participates in a proceeding against) is unlawful under Title VII. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001). Opposing discrimination includes "'informal protests of discriminatory employment practices, including making complaints to management.'" *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006) (quoting *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).

A plaintiff seeking to prove her retaliation claim through indirect evidence, as Gethers seeks to here, "may do so by applying the familiar *McDonnell Douglas* burden-shifting framework." *Id.* "After establishing a prima facie case of retaliation, the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Id.* If the employer provides such a reason, then "the burden shifts back to the plaintiff 'to convince the factfinder both that the employer's proffered explanation was false [that is, a pretext], and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (alterations in original)). "The onus is on the plaintiff to

establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the *McDonnell Douglas* framework to satisfy her ultimate burden of persuasion by proving pretext." *Id.*

In the context of a plaintiff's burden at the prima facie stage, the Third Circuit Court of Appeals clarified that a plaintiff must only produce evidence "'sufficient to raise the inference that her protected activity was the *likely reason* for the adverse employment action.'" *Id.* at 259 (emphasis in original) (internal quotations omitted). The Third Circuit noted that it has held that "a plaintiff must prove that retaliatory animus had a 'determinative effect' on the employer's decision to subject the employee to the adverse employment action," which is "functionally the same" as the Supreme Court's "but-for" causation standard. *Id.* at 258. "To prove a 'determinative effect,' the plaintiff must show 'by a preponderance of the evidence that there is a but-for causal connection' between the adverse employment action and retaliatory animus." *Id.* (quoting *Miller v. CIGNA Corp.*, 47 F.3d 586 586, 595-96 (3d Cir. 1995)). "Similarly, a plaintiff who proves that retaliatory animus was the 'real reason' for the adverse employment action will necessarily be able 'to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct.'" *Id.* (quoting *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013)). The Third Circuit further explained:

> [T]he Supreme Court has made clear that Title VII retaliation claims must be proved according to traditional principles of but-for causation. [*Nassar*, 133 S. Ct. at 2533]. Understanding the retaliation [—] plaintiff's ultimate burden, we turn to the question of whether that burden differs at the prima facie stage of the case. We hold that it does. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) ("In assessing causation, we are mindful of the procedural posture of the case."); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000). "[T]he relative evidentiary impact of [causal evidence] may vary depending upon the stage of the *McDonnell Douglas* proof analysis and the procedural circumstance," *i.e.*, if proffered to satisfy a plaintiff's prima facie case for the purpose of summary judgment or if proffered to reverse a verdict). Consistent with our precedent, a plaintiff alleging retaliation has a lesser causal

burden at the prima facie stage. *See e.g.*, *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) ("[T]he prima facie requirement for making a Title VII claim 'is not onerous' and poses 'a burden easily met.'" (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981))).

Some circuits have found, albeit without much in the way of explanation, that a plaintiff must prove but-for causation as part of the prima facie case of retaliation. *See EEOC v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (en banc); *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014). We decline now to heighten the plaintiff's prima facie burden to meet her ultimate burden of persuasion. That is because we agree with the Fourth Circuit that to do so

> would be tantamount to eliminating the *McDonnell Douglas* framework in retaliation cases . . . . If plaintiffs can prove but-for causation at the prima facie stage, they will necessarily be able to satisfy their ultimate burden of persuasion without proceeding through the pretext analysis. Had the *Nassar* Court intended to retire *McDonnell Douglas* and set aside 40 years of precedent, it would have spoken plainly and clearly to that effect.

*Foster*, 787 F.3d at 251. We conclude that at the prima facie stage the plaintiff must produce evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (emphasis added) (internal quotation marks omitted).

*Id.* at 258-59. Thus, in accordance with Third Circuit precedent, Gethers must produce evidence sufficient to raise the inference that her protected activities were the likely reason for her termination. Despite the relatively light burden as articulated by the Third Circuit, the Court concludes that Gethers has failed to satisfy same.

Gethers cites multiple examples of retaliation that the Court will separately address. First, she contends that PNC terminated her as retaliation for reporting Fahrion to the ERIC in August 2012 after he promoted Merz (white) to a position instead of her. (Docket Nos. 44 at ¶ 79; 46-1 at 16-17; 48 at 2). Reporting Fahrion to the ERIC is a protected activity under Title VII. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful

employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); *see also Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (noting that "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges," constitute protected activities) (internal quotations omitted); *Kerns v. Drexel Univ.*, No. 06-CV-5575, 2008 WL 2876590, at *19 (E.D. Pa. July 24, 2008) (finding that the plaintiff had engaged in protected activity under Title VII when he made an internal complaint to human resources). Termination is an adverse employment action. *Urbanic v. Donahoe*, No. 11-CV-805, 2013 WL 1149914, at *5 (W.D. Pa. Mar. 19, 2013) ("There is also no question that [a] termination decision constitutes a materially adverse action."); *Johnson v. McGraw-Hill Cos.*, 451 F. Supp. 2d 681 (W.D. Pa. 2006) (observing that "a retaliatory discharge on the part of an employer would constitute a 'materially adverse' act of retaliation" under *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)). Hence, Gethers must prove the third element of her prima facie retaliation case: that "there was a causal connection between her participation in the protected activity and the adverse employment action." *Nelson*, 51 F.3d at 386. Courts "consider 'a broad array of evidence' in determining whether a sufficient causal link exists to survive a motion for summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)).

A causation analysis often, but not exclusively, rests on two key factors:  "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of any pattern of antagonism in the intervening period." *Jensen v. Potter*, 435 F.3d

444, 450 (3d Cir. 2006) (internal quotations omitted). "The Court measures temporal proximity from the date on which the litigant engaged in his first protect[ed] action." *Gairloch v. Pa. State Univ.,* 84 F. Supp. 3d 407, 418 (M.D. Pa. 2015). "Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.'" *Jensen*, 435 F.3d at 450 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997)). In the absence of unusually suggestive temporal proximity or a pattern of antagonism, courts "consider all of the proffered evidence as a whole to determine whether it 'may suffice to raise the inference'" of causation. *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 367 (W.D. Pa. 2012) (quoting *Moore*, 461 F.3d at 346); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000) ("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference.").

With respect to temporal proximity, when "the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *Id.* (citing *Breeden*, 532 U.S. at 273-74). "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *Id.* at 233; *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (inference of causation not raised by five-month gap between employee's complaint and employer's first adverse action).

Here, the time span between Gethers's complaint to the ERIC and her termination is too long as a matter of law for her to show a causal relationship between the two events. Gethers reported Fahrion to the ERIC in August 2012. (Docket No. 44 at ¶ 79). PNC fired Gethers on August 7, 2013. (*Id.* at ¶ 46). The time span between the ERIC receiving Gethers's complaint and her termination is approximately a year, far longer than the three-month gap in *LeBoon* and the five-month gap in *Andreoli*. *LeBoon*, 206 F.3d at 233; *Andreoli*, 482 F.3d at 650; *see also Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004) (holding that a period of over two months between the protected activity and the plaintiff's termination was not sufficient alone to show a causal link); *Thomas v. Town of Hammonton*, 351 F.3d 108 (3d Cir. 2003) (holding that three weeks between the plaintiff's filing of a complaint and her termination did not demonstrate a causal link). As Gethers did not submit any other evidence tending to show that PNC terminated her because she engaged in protected activity, she is not able to state a prima facie case that PNC terminated her as retaliation for her complaint to the ERIC about Fahrion.[8]

Second, Gethers is unable to establish a prima facie retaliation case linking her complaint about Fahrion to PNC's alleged resistance to her receipt of unemployment benefits. Like her unsuccessful attempt to show that PNC fired her for complaining to the ERIC, Gethers is unable to demonstrate a causal relationship between reporting Fahrion to the ERIC and her initial difficulty in obtaining unemployment benefits. As stated above, PNC terminated her approximately a year after she asked the ERIC to investigate Fahrion's decision not to promote

---

[8] The Court notes that Gethers made complaints in her deposition that Fahrion would not approve classes for her, saying that she had too much work. (Docket No. 57-2 at 6). On the other hand, she pointed to as part of her claim of retaliation a class which she took and Siko did not. (Docket No. 46-1 at 76). Gethers failed to advance any argument based on Fahrion's action in these summary judgment proceedings. In this Court's estimation, these complaints do not rise to a level of retaliation, even when viewed in a light most favorable to her. At most, they show that Fahrion did not satisfy the employee manual's purpose to "[c]ounsel [employees] on how to correct or improve [their] work performance, work habits or work-related behaviors." (Docket No. 63-1 at 2).

her, (Docket No. 44 at ¶¶ 46, 79), a time period too long for Gethers to show that her complaint caused PNC to obstruct her receipt of unemployment benefits. *LeBoon*, 206 F.3d at 233; *Andreoli*, 482 F.3d at 650.

Third, Gethers argues that Fahrion retaliated against her by becoming "very cold" at work, by speaking less to her after she filed an internal complaint with the ERIC about his failure to promote her. (Docket No. 46-1 at 17). To satisfy the adverse-employment-action element, Gethers must "show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore*, 461 F.3d at 341 (quoting *White*, 548 U.S. at 68). Even assuming that Fahrion knew that Gethers complained about him to the ERIC and then talked less to her, Gethers is unable to state a prima facie retaliation claim. *See, e.g.*, *Holt v. Pennsylvania*, No. 10-CV-5510, 2015 U.S. Dist. LEXIS 109311, at *67 (E.D. Pa. Aug. 19, 2015) (granting motion for judgment as a matter of law and holding that the fact that a captain "had given a cold response" to the plaintiff's claims of race discrimination "was insufficient evidence for the jury to reasonably conclude that race was a determinative factor"). A reasonable employee would not be dissuaded from complaining about suspected discrimination in the workplace if less verbal interaction with a racially biased manager would be the only result. *See, e.g.*, *McDonnell v. Cisneros*, 84 F.3d 256, 258 (7th Cir. 1996) (implying in dicta that "the silent treatment can cause distress" but is not a materially adverse employment action); *see also Nelson*, 51 F.3d at 387-88 (holding that an adverse-employment action must affect the plaintiff's employment relationship with her employer rather than being generally objectionable conduct). Without more, Gethers is unable to state a prima facie case that PNC, through Fahrion, retaliated against her.

After considering Gethers's retaliation arguments against the record, the Court concludes that Gethers cannot establish a prima facie retaliation claim. Once again, there is no need to discuss whether PNC had an LNDR or whether its LNDR was pretext for unlawful retaliation against Gethers. Despite same, the Court remains convinced that Gethers and Jackson admitted that they violated PNC's code of ethics, which constitutes an appropriate LNDR for PNC to terminate them. (*See* Docket Nos. 44 at ¶¶ 42-43; 46-5 at 10). *See also Jackson*, 2016 WL 7324595, at *7.

### C. Gethers's Belated Attempt to State a Failure-to-Promote Claim

To the extent that Gethers's case could be read as a failure-to-promote claim, which PNC disputes, Gethers is not able to proceed because the deadline to do so passed long ago, and Gethers has not supported a failure-to-promote claim with any evidentiary proof. Fahrion allegedly passed over Gethers for a promotion on July 9, 2012. (Docket No. 46-3 ¶ 8). Charges of employment discrimination must be filed with the EEOC "within [180] days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).[9] Gethers has not provided any evidence that she filed a failure-to-promote charge with the EEOC within 180 days after July 9, 2012, the day Fahrion chose not to promote her. Therefore, Gethers is time barred from asserting a failure-to-promote claim.

---

[9] This deadline would have been 300 days had Gethers initially lodged charges with a local or state agency, 42 U.S.C. § 2000e-5(e)(1), which she did not.

**V.**    **<u>Conclusion</u>**

For the foregoing reasons, PNC's Motion for Summary Judgment, (Docket No. 42), will be granted, and Gethers's Motion for Summary Judgment, (Docket No. 47), will be denied.

An appropriate Order follows.


Dated:  May 9, 2017                                      <u>*s/Nora Barry Fischer*</u>
                                                         Nora Barry Fischer
                                                         United States District Judge


cc/ecf:  All counsel of record.

         Jalaine Gethers, pro se
         518A North Negley Ave.
         Pittsburgh, PA 15206
         Certified and Regular